IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2026 Session

## IN RE HEAVENLEE J.

**Appeal from the Juvenile Court for Macon County**
**No. 2023-JT-2      Gregory Wayne Traylor, Judge**

_____

### No. M2025-00543-COA-R3-PT

_____

Father appeals the termination of his parental rights on grounds of abandonment by an incarcerated parent, persistent conditions, and failure to manifest an ability and willingness to assume custody. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., C.J., and ANDY D. BENNETT, J., joined.

Michael R. Stooksburg, Knoxville, Tennessee, for the appellant, Timothy J.

Jonathan Skrmetti, Attorney General and Reporter; Jordan K. Crews, Senior Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I.      FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2023, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition in the Macon County Juvenile Court ("the trial court") to terminate the parental rights of Respondent/Appellant Timothy J. ("Father") and Respondent Janice F. ("Mother") to their child, born in February 2023.[1] Mother surrendered her parental rights and is not at issue in this appeal. The petition alleged that the child was placed in DCS custody in March 2023 under an emergency protective order

---

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

and adjudicated dependent and neglected by order of November 16, 2023. As grounds for termination, the petition alleged abandonment by an incarcerated parent, persistent conditions, mental incompetence to parent, and failure to manifest an ability and willingness to assume custody.

Trial was continued on several occasions; the petition was eventually heard on March 7, 2025. Father was not present for the hearing. DCS asked to proceed in Father's absence, while Father's appointed counsel asked for a continuance of the trial. The trial court denied the continuance, later explaining that Father was personally served with the petition to terminate his parental rights, was appointed counsel to represent him, and was informed of the date, time, and location of the final hearing. Yet, Father failed to appear or file any responsive pleading in response to the petition. Moreover, the trial court found that Father's counsel's basis for the continuance—Father's housing instability—was not good cause for a continuance. So the trial proceeded without Father.

Lisa King, the child family service worker, and the child's foster mother, Nicki R. ("Foster Mother"), were the only witnesses. Ms. King explained that the child was placed in DCS custody due to nutritional neglect and failure to thrive. The child was born with severe gastrointestinal issues that require special care. But in the weeks following the child's birth, she lost ten percent of her body weight, causing health care workers to be concerned that she was not being properly fed. And when questioned, DCS came to believe that Mother's mental capacity made her incapable of properly caring for the child. Father was present during this time and would participate in the child's care by giving her bottles of formula prepared by others but declined to change diapers due to his presence on the sex offender registry.

The record shows that Father was convicted of using electronic communication to procure sex with a minor in Kentucky in 2014 and was placed on the sex offender registry for life. In 2020, Father was charged with violating the terms of the sex offender registry when he failed to update his address. He thereafter failed to appear for several hearings, was arrested sometime in 2023 after the removal of the child, and eventually pleaded guilty to the original charge in January 2024, when he was released from incarceration on probation. After his release, Father resided in Kentucky with his mother until, according to his attorney, he was evicted in the days before the termination trial.

Father's ability to care for the child's medical issues was of particular concern to Ms. King. The child was placed with her foster family immediately upon removal at four weeks old and had resided continually with them by the time of trial. Although the child's malnutrition improved immediately upon removal from her parents' care and her placement with the foster family,[2] the child's medical issues have caused her to be

---

[2] Foster Mother testified that she simply set an alarm to feed the child every two hours during her infancy. Now, the child enjoys a typical toddler diet.

hospitalized on seven occasions, with four surgeries to date. Her most recent hospitalization occurred due to a simple norovirus, as some viruses affect the child more severely due to her preexisting conditions. Due to the child's issues, she has hypermobility of the bowels and may never have full control of her bladder and bowels. As a result, the child can have five or more bowel movements a day and requires special diapers and diaper cream to prevent diaper rash.

Ms. King testified that over the nearly two years since the removal, it was her belief that Father suffered from his own developmental delays such that "he cannot really take care of himself. He relies on other people." As a result, Ms. King testified that Father could not care for a medically fragile child, always indicating that his family would take care of them both, particularly Father's mother. But Ms. King also had concerns about the paternal grandmother's ability to care for a child, much less one with severe medical issues.

Additionally, the child's medical conditions require that she receives treatment from multiple specialists, with at least one medical appointment per week. These specialists include a gastrointestinal team, a pediatric surgeon, an ear, nose, and throat doctor, and soon, a speech therapist. The majority of the child's specialists are affiliated with Vanderbilt University Hospital ("Vanderbilt"). According to Ms. King, however, Father is not permitted on Vanderbilt's property, due to his status as a registered sex offender. Although Father's counsel questioned whether a hospital where Father lives would have the same policy, Ms. King testified that Father never informed her that he had inquired about possible doctors for the child where he lives. Indeed, he could not even inform Ms. King of his own doctor's name.

Ms. King testified that she performed a home visit of Father's home with the paternal grandmother in November 2024. The home was not furnished, with mattresses on the floor near a space heater and an ashtray full of cigarette butts. Father also had no items prepared or purchased for the child, such as clothes, toys, or a crib. During this home visit, Father failed a drug screening for Suboxone, for which Father had no prescription. Although Father has two other children, he does not have contact with them.[3] Although Ms. King conceded that she had not visited Father's new home, she testified that he was unwilling to provide her with the address when she asked.

Father visited no more than three times in the two years the child had been in DCS custody, all of which occurred prior to his May 2023 incarceration. Ms. King testified that she reached out to Father on many occasions to discuss visitation following his release from incarceration. Often, Father told Ms. King that he would "try to make it" only to then inform her that he could not visit due to issues with his probation, transportation, or sickness. Ms. King attempted to coordinate with Father's probation officer to be allowed a

---

[3] When Ms. King asked Father to explain why he had no contact with these children or for how long he had been out of contact, he refused to respond.

pass to travel to Tennessee for necessary meetings or visits, but Father did not follow through.[4] When Father declined a visit, he never asked for a different date. Father also never paid any child support for the child or offered to provide her any necessities or gifts. Although Father spoke with Ms. King fairly regularly, he never asked about the child, asked for pictures of the child, or inquired about her health conditions. Instead, he simply asked about court dates.

Ms. King testified that the foster family is the only family that the child knows and that she has no memory of Father. Indeed, Ms. King testified to her belief that Father would not be able to pick the child out of a lineup. Foster Mother echoed that the child is very well bonded to her, her husband and daughter, and their extended family. Ms. King testified that the child is particularly bonded to Foster Mother, becoming upset when she leaves the room. Foster Mother testified that her family wishes to adopt the child should termination be granted.

Father did complete a virtual parenting assessment in July 2024, which recommended parenting classes and a psychological evaluation. However, Father completed neither of the recommended steps, as DCS was unable to pay for these items in Kentucky where Father lived and Father again claimed he could not obtain a pass from his probation officer to attend the necessary meetings in Tennessee. The parenting assessment concluded that Father had moderate parenting knowledge, despite Ms. King's concern about his cognitive abilities.

The trial court issued an oral ruling on March 20, 2025, which was memorialized by a written order entered that same day. Therein, the trial court ruled that DCS failed to prove the ground that Father was not mentally competent to parent, but had proven the grounds of abandonment, persistent conditions, and failure to manifest an ability and willingness to parent the child. The trial court also found that termination was in the child's best interests. This appeal followed.

## II.    ISSUES PRESENTED

In addition to the typical issues in all termination of parental rights cases—grounds for termination and best interest—Father also asserts that trial court erred in denying his counsel's oral motion for a continuance. For the following reasons, we affirm the decision of the trial court.

## III.    STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental

---

[4] Ms. King testified that she spoke directly to Father's probation officer about this issue. When Ms. King testified about the substance of that conversation, the trial court sustained an objection to hearsay.

liberty interests protected by the Due Process Clauses of the federal and state constitutions." ***In re Carrington H.***, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." ***Id.*** at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." ***Id.*** at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See **In re Valentine***, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." ***In re Addalyne S.***, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has previously explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); ***In re Justice A.F.***, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn.

- 5 -

2002); ***In re Justice A.F.***, 2012 WL 4340709, at *7 (citing ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. ***In re Taylor B.W.***, 397 S.W.3d at 112; ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re Justice A.F.***, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See* ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also* ***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

***In re Markus E.***, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Continuance

Father's first argument on appeal is that the trial court erred in denying his counsel's motion to continue. In a prior case also involving termination of parental rights, we confirmed that the trial court's decision to grant or deny a continuance lies in the trial court's sound discretion:

> "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." ***State Dep't of Child.'s Servs. v. V.N.***, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008) (quoting ***Blake v. Plus Mark Inc.***, 952 S.W.2d 413, 415 (Tenn. 1997)). In requesting a continuance, Mother bears the burden to "establish[] the circumstances that justif[ied] the continuance." ***In re Paetyn M.***, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019) (citing ***Osagie v. Peakload Temp. Servs.***, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002)). "Decisions regarding the grant or denial of a continuance are fact-specific and 'should be viewed in the context of all the circumstances existing' at the time of the request." ***Id.*** (quoting ***Nagarajan v. Terry***, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003)). These circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." ***Id.*** (quoting ***Nagarajan***, 151 S.W.3d at 172).

*In re Chayson D.*, 720 S.W.3d 123, 133–34 (Tenn. Ct. App. 2023) (quoting *In re Azhianne G.*, No. E2022-00223-COA-R3-PT, 2023 WL 2487390, at \*2 (Tenn. Ct. App. Mar. 14, 2023)).

In *In re Chayson D.*, the mother's counsel also moved for a continuance on the morning of trial, explaining that he had no explanation for her absence. *Id.* at 134. We concluded, however, that the trial court did not abuse its discretion in denying the continuance, as there was no argument that a continuance would have been in the child's best interest. *Id.* (citing Tenn. Code Ann. § 36-1-113(k) (providing that the hearing on a petition for parental termination shall take place within six months from the date the petition was filed, unless granting an extension is in a child's best interest)). We further noted that the parent had ample notice of the hearing and there was no proof that her failure to appear was due to something unforeseen. *Id.*

The same is essentially true in this case. First, this case had been pending for well over six months and there is nothing in the record that indicates it would have been in the child's best interest to delay the hearing. Although Father's counsel made a valiant effort to provide more explanation for Father's absence than in *In re Chayson D.*, his stated reason for being absent was not an emergency situation or unforeseen. The proof further shows that Father had ample notice of the hearing date, as his counsel informed him of the date of trial and urged him to be present, and he often spoke to Ms. King to confirm court dates. So the trial court did not abuse its discretion in denying the request for a continuance in this case.

## B. Grounds

Three grounds for termination are at issue here: abandonment by an incarcerated parent, persistence of conditions, and failure to manifest an ability and willingness to parent the child. We will consider each ground in turn.

### 1. Abandonment by an Incarcerated Parent

Parental rights may be terminated when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]" Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, Tennessee Code Annotated section 36-1-102 defines abandonment as follows:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition . . . and has:
>
> . . . .
>
> (*c*) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton

disregard for the welfare of the child[.][5]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Here, there is no dispute that Father was incarcerated at the time that DCS filed the petition to terminate Father's parental rights. The question, then, is whether Father engaged in conduct during the child's life that exhibited a wanton disregard for the child's welfare.

The trial court concluded that DCS proved this ground by clear and convincing evidence, citing Father's failure to comply with sex offender registry requirements and "thereby jeopardizing his freedom and ability to parent." The trial court noted that while the date of his charge for absconding was pre-conception, Father continued to abscond for some time thereafter, which essentially constituted a continual criminal violation. The wanton disregard ground for termination

reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

*In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Although the term "wanton disregard" is not defined by the statute, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867–68 (collecting cases).

The proof does show that while Father's violation of the sex offender registry occurred in 2020, he was not arrested on this charge until 2023, after the child was born. But even setting aside whether this fact is evidence that Father continued to abscond from the law after the birth of the child, we conclude that other evidence in the record supports this ground for termination. Importantly, the record shows that Father failed to take advantage of opportunities to visit the child, such that he has had no visitation since May 2023. First, of course, Father's arrest prevented him from visiting the child for at least seven months. Later, he often claimed that he could not visit Tennessee due to the terms of his probation upon his release; but sometimes his excuse changed to that he simply could not make the visit or that he was having transportation issues or issues with sickness. What never changed is that Father never made any real attempt to attend a visit, never requested

---

[5] Throughout this Opinion, we apply the version of the relevant statutes that were in effect at the time the petition was filed. Much of Father's argument as to this ground focuses on an older, inapplicable version of this statute.

any visitation with the child,[6] and never requested different dates when he could not make the offered visit. He also never followed through with Ms. King's offer of assistance to facilitate obtaining whatever pass was needed from his probation officer.

Moreover, Father never provided any support or gifts of any kind for the child after she was removed from his custody. Father also failed one drug test—apparently the only one given to him in this case—during Ms. King's home visit in November 2024. Under these circumstances, we conclude that DCS proved this ground for termination by clear and convincing evidence.

## 2. Persistence of Conditions

The next ground for termination found by the trial court is persistence of conditions, also known as persistent conditions. This ground applies when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

The purpose of the persistent conditions ground for termination is "to prevent the

---

[6] Nothing in the proof mentions the possibility of visitation taking place telephonically or over Zoom, perhaps due to the young age of the child and the fact that she was only speaking about fifteen words by the time of the termination trial.

child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008)). As we have previously explained,

> "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, [] 2008 WL 4613576, at \*20 [] (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion . . . that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

*In re Navada N.*, 498 S.W.3d at 605–06. Accordingly, "[t]his ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them." *In re Allison S.*, No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at \*9 (Tenn. Ct. App. May 8, 2024) (quoting *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at \*17 (Tenn. Ct. App. Nov. 6, 2020)). Moreover, this statutory ground also applies when conditions other than those for which the child was removed "exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

Father does not dispute that the child was removed from his physical custody for more than six months by an order entered in the course of a dependency and neglect action. Rather, he argues that the reasons for the child's removal were not solely his fault. Moreover, he argues that the reasons for the child's removal—malnutrition, diaper rash, and the condition of the home—have now been remedied. Father also points to the conclusion of the parenting assessment that he has moderate parenting knowledge and argues that the evidence of his current condition was lacking, as DCS had little in-person interaction with him.

Respectfully, we disagree. It is true that the foster family has remedied the acute physical symptoms that the child was experiencing at the time of the removal. But the true condition that necessitated removal of the child was that her parents were not adequately caring for her sensitive medical needs. Absolutely nothing in the record indicates that Father can competently do so now. Although Father did take a parenting assessment, he

did not attend parenting classes or a psychological evaluation, as recommended by the assessment. Thus, even if we were to credit Father's claim that he was never permitted to leave Kentucky except to attend court, the record shows that he simply did not do the tasks that were required to demonstrate that he was capable of caring for his medically fragile child.

Importantly, the only home that Father allowed DCS to visit was not furnished and had several unsafe conditions. Moreover, Father rarely, if ever, inquired of the child's extensive health needs, nor has he demonstrated that he can adequately parent a child with such needs. Father would also not be permitted to attend any medical appointments where the child's care is currently located and had not made any effort to inform DCS of other medical providers he had found for the child local to him. Indeed, when Father was asked how he planned to care for the child's medical needs, Father had no plan other than a vague reference to how his family would help him. Father also failed a drug test during the only home visit that occurred. And he did not appear for the trial in which the permanent cessation of his rights to the child was at issue.

This case was pending for more than a year before trial, and the child has been in DCS custody for approximately two years. During this time, Father failed to demonstrate that he had made any effort to create a home that would be safe for the child. As such, the trial court was not wrong to conclude that these conditions were unlikely to be remedied at an early date. Moreover, the child is in a safe home that has demonstrated that they can care for the child's unique medical needs and wishes to adopt her. The trial court therefore did not err in finding that clear and convincing evidence supports this ground for termination.

### 3. Failure to Manifest an Ability and Willingness to Parent

The trial court also determined that Father failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated under this section when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince *either* an ability *or* a willingness to assume custody of the child. ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020). Our analysis of a parent's ability "focuses

on the parent's lifestyle and circumstances," while willingness involves the parent's attempts "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citations omitted).

The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Although "risk of substantial harm" is not defined by the statute, this Court has provided examples of situations resulting in such a risk, including "forcing a child to begin visitation with a near-stranger," "placing a child with a parent who engaged in repeated criminal conduct that required incarceration," or returning a child to "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence[.]" *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases).

On appeal, Father argues that DCS did not do enough to communicate with him, as their entire interaction with Father totaled less than two hours. He also argues that in order to comply with his probation, he was not permitted to travel to Tennessee.

Respectfully, we do not agree. Here, Ms. King testified that she attempted communication with Father on many occasions but that he gave various excuses for always refusing to travel to Tennessee. And Ms. King traveled to Kentucky to visit Father's home, only for him to apparently be evicted a few months later. To the extent that Father blamed his probation on his inability to travel, Ms. King testified that she attempted to help Father obtain passes to travel, but Father never followed up with that offer. Indeed, Father claimed that he was permitted to travel for court hearings, but failed to appear for the final, most important hearing in this matter. Father also failed to make any effort toward supporting the child in any manner.

Moreover, the evidence leads us to seriously doubt that Father is ready and able to care for this particular child. According to the testimony, the child's medical conditions are extensive and require consistent, intensive care; Father, however, could articulate no plan to care for the child, had no doctor's offices in line to care for the child, and his most recent home was completely inappropriate for the child. Under these circumstances, we conclude that Father has failed to manifest that he is either willing or able to take physical custody of or financial responsibility for the child.

We further conclude that placing the child in Father's care would likely result in serious emotional and physical harm to the child. The child was in both Mother's and Father's physical custody when she became so underweight that she was hospitalized and removed. Since that time, however, Father has not demonstrated that he has any understanding of the child's medical needs or that he now has the ability to care for a medically fragile child. Moreover, the evidence shows that Father is nothing more than a

stranger to the child, and she would be seriously emotionally harmed by being removed from the only family that she has ever known. Thus, returning the child to Father's care would pose a substantial risk to both the child's physical health and psychological well-being. Accordingly, we affirm the trial court's finding that DCS met its burden to prove the ground of failure to manifest an ability and willingness to parent by clear and convincing evidence.

## C. Best Interest

Because at least one ground for termination exists, we proceed to consider the trial court's findings as to the child's best interest. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interests of children include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

- 13 -

the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (directing the court to "consider all relevant and child-centered factors applicable to the particular case before the court").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at

878).

Here, the trial court found at least fifteen factors—(A), (B), (C), (D), (E), (F), (H), (I), (M), (N), (O), (P), (Q), (R), and (S)—weighed in favor of termination and five factors—(G), (J),[7] (K), (L), and (T)—were inapplicable.[8] As "there exists a significant overlap between some factors," our review of the child's best interest is "based on the overarching themes within the list of twenty factors." **In re Chayson D.**, 720 S.W.3d at 144.

Father does not address any of the relevant factors individually but offers a global argument that

> the primary throughline that permeates this case is the assertion that the Father is unable to care for the child and take her to doctor's appointments at Vanderbilt Children's Hospital because of his presence on the registry. This line of reasoning is easily refuted by the fact that, if the child was in his care, he would almost certainly take her to different specialists because he lives in Kentucky.
> Additionally, . . . just because Father here is patently unfit, does not mean that the Court should forever sever his rights to his [daughter]. Father has done no misconduct to his child to render the relationship irredeemable, and the child is still young enough that a good relationship could be fostered though therapeutic visitation. This would also help [F]ather, who ostensibly stayed away not only from his difficulties crossing state lines, but also from his desire not to "hurt" his child. The Court, therefore, should not punish Father for doing what he genuinely believed was in his child's best interest.

(Record citation omitted). After our consideration of the relevant best interest factors, however, we agree with the trial court that the child's best interest is served by terminating Father's parental rights.

We turn first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability),

---

[7] The trial court made inconsistent findings under factor (J), concerning whether there is criminal activity in the home such that the parent has made a lasting adjustment of circumstances, finding it both in favor of termination and inapplicable. Here, although it does appear that Father did test positive for an unprescribed substance in November 2024, there is no evidence that he was engaging in any criminal activity upon his most recent release from incarceration. Given the trial court's inconsistent findings, we treat this factor as more or less equal.

[8] The trial court's order does not always explain why it found a ground inapplicable. Depending on the circumstances, this Court has classified a factor for which there was a lack of evidence as, variously, weighing against termination, being neutral, or being inapplicable. *See* **In re Colten B.**, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9–10 (Tenn. Ct. App. Jan. 21, 2025) (including a thorough discussion of the approaches taken in similar situations). Regardless, a factor that is merely neutral or inapplicable cannot be said to weigh in favor of termination.

- 15 -

(B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the child). Other than the sparse evidence of Father's mental and emotional fitness under factor (T), we agree that DCS presented clear and convincing evidence that each of these factors support termination. While the child is extremely closely bonded to her foster family, Father is a stranger to her. Father has been completely absent from her life either due, at worst, to his lack of effort to obtain permission to visit Tennessee or, at best, to his own criminal actions that have made visitation unavailable. Given Father's lack of participation in visitation thus far, we have little confidence that he would attend any therapeutic visitation that was set up if termination was not granted.[9] Moreover, Father's lack of diligence so far in the child's life leaves us to doubt that he can be counted on to care for a medically fragile child. Placing the child in Father's custody on little more than hope that Father would properly care for the child this time is likely to have a negative effect on her, both physically and emotionally.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). Although the child was too young to express any fear of Father or his home, there is no doubt that she fears being removed from Foster Mother. Moreover, Father has previously been involved in a situation in which the child was so neglected that she was seriously malnourished. While this instance may not have been the result of ill intent, nothing Father has done has indicated that he now understands how to care for his child's specific medical needs. Father also has neither custody nor contact with his older children. Moreover, Father's previous criminality, his positive drug screening, and his recent eviction indicate that his home is unstable. Thus, the majority of these factors also favor termination.

We turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs), (S) (involving whether the parent has consistently provided more than token support). In this

---

[9] As we perceive it, Father's argument essentially asks that the child should be removed from the only home she has ever known and placed in a new foster home in Kentucky simply so that he could have easier access to visitation with her. Given that Father has done nothing to nurture a relationship with the child thus far and the child is closely bonded to her current foster family, we obviously cannot agree that such a plan serves the child's best interest in any way.

case, Father has never met the child's needs medically, as he was present when she was neglected as an infant and has not demonstrated a current understanding of how to care for her. Moreover, Father has paid no child support for the entirety of the time that the child has been in DCS custody. And Father declined DCS's efforts to facilitate travel to Tennessee to take the recommended parenting classes and psychological evaluation. These factors therefore also favor termination.

Thus, the clear majority of factors favor termination in this case. Indeed, this case presents a clear picture that termination is in the child's best interest. On the one hand, the child is in a safe and secure home, with the people that she views as her parents and that have demonstrated that they are capable of taking care of her serious medical needs. On the other hand, Father was recently evicted from his home and his status as a sex offender makes him unable to participate in the child's medical care with the providers where she has historically received care. Critically, Father made so little effort to be a parent to his child that he did not even attend the final hearing on the termination of his parental rights. The trial court therefore did not err in concluding that clear and convincing evidence was presented that termination is in the child's best interest.

## IV. CONCLUSION

The judgment of the Macon County Juvenile Court is affirmed, and this cause is remanded for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Timothy J., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE